## YORK *v.* PASSAIC ROLLING-MILL CO.

*(Circuit Court, D. New Jersey.* March 30, 1887.)

1. SPECIFIC PERFORMANCE—GOOD FAITH OF COMPLAINANT.

 Defendant, in order to interest plaintiff, a valued employe, in its business, gave him a written agreement to give him, in addition to his salary, 28 shares of its stock, to be paid for out of the dividends thereof. Subsequently plaintiff, against defendant's wish, severed his connection with defendant, and surrendered the contract for the stock. Plaintiff suing for a specific performance of the contract to deliver stock, *held,* that he was not entitled to recover, since he had voluntarily rescinded and surrendered his contract.

2. CORPORATIONS—STOCK—DELIVERY OF CERTIFICATE.

 Defendant drew up a certificate of stock to plaintiff, which it retained in the stock-book, and indorsed thereon a receipt by defendant for plaintiff. *Held* that, the certificate never having been delivered, plaintiff acquired no rights thereby.

3. LACHES—UNEXPLAINED DELAY.

 The plaintiff delayed bringing suit till seven years after the defendant's refusal to give him the stock. *Held,* too long a delay, no excuse therefor being shown.

*Preston Stevenson,* for complainant.

*H. A. Williams,* for defendant.

BUTLER, J. The suit is virtually for specific performance of a contract for the purchase and sale of stock. This view cannot, we think, be avoided, notwithstanding the skillful preparation of the bill, and the able argument addressed to the court in the hope of escaping it. The bill avers ownership of the stock, refusal by respondents to deliver a certificate, and then sets out a contract of purchase and sale as the foundation of complainant's rights. The answer denies the material averments of the bill, and further sets out what the respondents allege to have been the contract, differing essentially from that set up in the bill. It then avers that complainant failed to perform his part; that, in consequence, the contract was canceled by agreement, and the complainant's right thus terminated.

The court finds the following facts:

In the year 1873, or early part of 1874, the respondents, owners and operators of iron-works, which they had recently improved, and prepared for a more extensive business, entered into a parol contract with the complainant, (who was then in their employment, and considered a superior workman, whose services it was important to retain,) to sell him 28 shares of stock, (worth $5,000,) on terms and conditions there specified. The respondents' object was to identify the complainant with them in interest, and thus secure his continued services in their business. This was the only consideration for the contract on the respondents' part, and was so understood by the complainant. The latter was receiving a large salary, ($3,500,) which was to be continued; and the stock was to be paid for wholly out of dividends, if any were made. After the lapse of some time he became dissatisfied, in consequence of the absence of written evidence of his right, and demanded something to show for it; whereupon the respondents, on the nineteenth of December, 1874, executed and delivered to him a paper in the following terms:

"With a view to make Levi D. York personally interested in the success of this company, and with the understanding that his best endeavors thereto will be continued for a time long enough at least to fulfill the intent of this agreement, we, the Passaic Rolling-mill Company, by the hand of our president, do agree, in addition to the salary paid to said L. D. York, to place to his credit, under date May 1, 1874, twenty-eight shares (28) of our capital stock, valued at that date, according to the books of the company, at five thousand (5,000) dollars, subject to the following conditions, viz.: Said L. D. York is to pay to the said company the value aforesaid, with interest at 7 per cent. per annum from May 1, 1874, out of the dividends declared on said shares of stock; but, in case no dividends should be declared, the said L. D. York cannot be held in any other way liable or responsible to the said company for the debt. In case of permanent injury or death, then he or his heirs shall receive the full benefit arising from ownership of said shares, the same as intended to him if in health. Upon the payment to the company of the value, with interest, said L. D. York, or his heirs, to have and to hold said shares in his own hand and right. WATTS COOKE, President."

The complainant received this paper with expressions of satisfaction, and retained it until about the time of leaving the company, in the summer of 1878. The paper must therefore be regarded as conclusive respecting the contract. It was prepared and delivered for the purpose

of bearing witness to the terms, at a time when they were fresh in mind, and was accepted and retained by complainant as the only evidence of his right.   The attempt now made to get rid of it, and substitute the complainant's recollection of the parol agreement, cannot be listened to. In May, 1875, at the next meeting of stockholders after delivery of the paper, a resolution was adopted, acknowledging the complainant's right under it, and setting aside the stock for delivery when his part of the contract should be performed.   In pursuance of this resolution, the president and secretary filled up a blank certificate in the complainant's name, which remained without severance from the book containing such form.   Across it was written an acknowledgment of its receipt by the *company*, for complainant.   This filling up and indorsement of the certificate was a meaningless formality, which left the rights of the parties undisturbed.   The contract entitled complainant to the stock on fulfillment of its terms.   Up to that time the respondents were to retain it. It was not to become his.   Filling up a certificate in his name, and *delivering it to themselves*, left the matter precisely as it was before.   The appeal to this meaningless (if not foolish) act, as an execution of the contract, need not, we think, receive further notice.

The complainant, who stood well with the company, and seemed to have been on intimate and friendly terms with its officers, was allowed to participate in the meetings of stockholders, and to vote on questions arising there.   At these meetings statements were made by the officers of the company of its financial condition, which were discussed by the stockholders, the complainant participating.   In August, 1878, the complainant resolved to embark in an adventure abroad, made his arrangements accordingly, and gave notice to the company of his intention to quit its employment.   His arrangements embraced the withdrawal from their service of several other desirable, skilled workmen.   The respondents were seriously dissatisfied with and embarrassed by this movement, and consequently remonstrated against it; reminding the complainant of his agreement, claiming that he was bound to remain, earnestly urging him to do so, and endeavoring to persuade him that the improved prospects of the business justified a conclusion that his interests would be best promoted by remaining.   He was firm, however, in the determination to go, having, as he asserted, so bound himself to others that he could not remain.   In consideration of the circumstances, it was then agreed that he would abandon his right to the stock, and surrender the paper which he held as evidence of the contract.   Consequently, on the twenty-fourth of August, 1878, the paper was surrendered, and, in the presence of the complainant, was indorsed, "Surrendered and canceled."   This indorsement was read to the complainant, who fully assented to it, though declining to sign his name, on the ground that it was unnecessary.   The company then canceled the certificate which had been filled up, and distributed the shares among its stockholders.   The relations of the parties were thus terminated, and the complainant went abroad, (to South America.)   After the lapse of several months he returned, the enterprise in which he had embarked having

failed. Subsequently he called at the respondents' works, without preferring any claim or complaint. On the third of December, 1879, however, he procured a letter to be addressed to them by his attorney, in the following words:

"TRENTON, N. J., December 3, 1879.

"*The Passaic Rolling-mill Co.*—GENTLEMEN: I am in receipt of a letter from Mr. Levi D. York, formerly connected with your company, and now in Portsmouth, O. Mr. York tells me that in the year 1873 the Passaic Rolling-mill Co. placed on their books, to his credit, stock amounting in value to $5,000. He says no certificate has ever been given him, which is probably merely an oversight, and instructs me, as his attorney, to request you to send such certificate of stock to me, or arrange a settlement of its value with me. I trust that I shall soon hear from you.

"Yours, respectfully, GEO. D. SCUDDER."

To this the respondents made answer as follows:

"THE PASSAIC ROLLING-MILL CO.,

"PATTERSON, N. J., December 5, 1879.

"*Mr. Geo. D. Scudder*—DEAR SIR: Your favor at hand. We know of no agreement to give Mr. York any stock in our company. We once made an agreement to sell him some, which was canceled by him over a year ago. Whatever *failure* to keep to *agreements* there may be is entirely on his side.

"Resp'y, W. O. FAYERWEATHER, Treas."

Matters thus rested until the twentieth day of July, 1885, when this suit was commenced.

Several important questions are raised by the foregoing statement, all of which were earnestly discussed by counsel. The view we entertain of the case, however, renders necessary the consideration of one of them only.

That the complainant agreed, for a sufficient consideration, to surrender his right to the stock, and that this agreement was carried into execution by the return and cancellation of the paper before referred to, is a fact so clearly established as to admit of no doubt. The attempt now made to avoid the effect of the paper, by asserting that the complainant's right did not spring from or depend upon it; that its cancellation, therefore, left the right undisturbed; and to set up the complainant's alleged recollection of the parol agreement as the foundation of his claim,—does not, as before suggested, seem worthy of more serious consideration than has already been given it.

It is further urged, however, that the agreement to surrender the right was procured by means of fraud. To this there seems to be more than one answer. It does not appear that the respondents were guilty of such fraud. Indeed, it does not appear that they *procured* this agreement. They did not desire it, except in an event over which the complainant had absolute control. On the contrary, they desired and urged him to retain his right, assuring him that it was valuable, and that his interest would best be promoted by continuing his connection with them. The severance of this connection, and all he did in accomplishing it, were his own free, voluntary acts. We are unable to discover the slightest evidence of unfairness on the respondents' part throughout their intercourse

with him. The relations of the parties were not fiduciary in character; they were purely contractual. The respondents were not, therefore, called upon to furnish the complainant with information, which he did not request, respecting the stock. It does not even appear that they had any of which he was not possessed. He differed with them in judgment regarding its value, rating it very low, while they rated it high, as they informed him. The assumption that he was ignorant, and did not understand the company's statements of its financial condition, (made and discussed in his presence, at its meetings,) is not justified by anything in the case. The company was not prosperous during his connection with it. The testimony of Mr. Fayerweather, and others familiar with its condition, leaves no room for doubt of this. No dividends were declared, and the stockholders, who had invested largely, received nothing for their outlay. The books, cited as evidence to the contrary, we do not pretend to understand. Their statements of surplus, as well as the increase of capital, were doubtless based on improvements in real estate, increase of machinery and tools, valued at cost. This improvement and increase of property were probably the result of borrowing and other increase of indebtedness. However this may be, we do not regard the citations from the books as entitled to much weight, when arrayed against the positive and intelligent testimony of the witnesses just referred to. Subsequently to his withdrawal, circumstances changed. The country gradually recovered from the depression consequent upon the panic of 1873. A new field opened for the peculiar and special character of work turned out by the company, and it prospered and made money. This, however, as we have seen, is what the respondents had prophesied to be probable, and urged upon the complainant as a reason why he should retain his stock, and continue his connection. We need not enlarge on the subject. It seems clear that the complainant has himself alone to blame for what he did in the premises.

Then, again, if this agreement and its execution (by which the right to stock was surrendered) was fraudulently procured as alleged, the complainant should have proceeded promptly to set it aside, and rid himself of the consequences. Instead of waiting seven years before commencing suit, he should have proceeded at once on discovering the fraud, or with as little delay as was reasonably possible. When, after his return from South America, he employed counsel, and asserted his alleged right, it must be presumed he had all the knowledge he possessed when the suit was commenced. He had no occasion to wait until the respondents formally denied his right, in answer to his attorney's demand. He knew beforehand that they denied it; that they stood upon the agreement of surrender, and its execution. We need go no further. For the reasons stated, it seems plain, not only that equity does not require us to annul and overturn the settlement, but that to do so, and thus open up to controversy and litigation the difficult questions arising out of the former relations of the parties, which the settlement was intended to put at rest, would be a serious wrong.

A decree must be entered for the defendants, with costs.